## TRAVELSTEAD & SONS CONSTRUCTION COMPANY, INC. *v.* IGLEHART, ET AL.

[No. 372, September Term, 1965.]

*Decided November 10, 1966.*

The cause was argued on 5/24/66 before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and McWILLIAMS, JJ.;

and reargued on 10/11/66 before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ., and CARTER, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

Argued on 5/24/66 by *George Ross Veazey* and reargued on 10/11/66 by *J. Joel Woodey* for appellant.

*Frank T. Gray,* on both arguments, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

In December 1964 appellant (Travelstead) filed a mechanic's lien claim in the Circuit Court for Baltimore County against the buildings it had just constructed on a 4.2 acre tract of land on the north side of the Baltimore County Beltway just west of North Charles Street. Of the defendants named therein we need be concerned only with appellees (Beltway). Twelve weeks later Beltway filed a petition [Code, Art. 63, § 28 (1964 Repl. Vol.) and Maryland Rule BG 75 a] to compel Travelstead to prove the validity of its lien. Travelstead demurred and answered, filing with its answer the details of its claim. Beltway, in its response, offered as a complete defense to Travelstead's lien claim, a "Memorandum of Understanding" (Memorandum) which it claims acquits it of any liability to Travelstead. Appended to Beltway's response is a motion for summary judgment and supporting affidavits. Travelstead, answering the motion, denied that the Memorandum was a release and attached affidavits in support of its position.

At the conclusion of argument on 21 June 1965 the trial court (Raine, J.), after stating his reasons for so doing, announced that he would grant the motion for summary judgment. On 2 August he signed and filed an order to that effect. The order concluded with the words "said claim is therefore ruled null and void." This appeal followed.

To understand what has happened in this unusual and at times incomprehensible transaction it is necessary to look to its beginnings. Just when Iglehart and Pinkard (Beltway) first conceived this enterprise can not be ascertained from this record. However, it is clear that by September of 1963 matters

were well past the negotiation stage. On 24 September the owner of the 4.2 acre tract leased it to Beltway for 21 years with an option to renew for an additional term of 25 years and an option to purchase at any time after 10 years for $160,000. There followed a series of sub-leases obviously designed to take care of commitments already made to Sperry Rand Corporation and Thermo-Fax Sales, Incorporated for the erection of buildings appropriate for their respective uses and to be rented to them on terms already agreed upon. Although the record is silent in this regard we must assume that Beltway and Travelstead, for some months before September, engaged in discussions which resulted in Travelstead's letter of 23 September, which we have set forth in full. We have italicized passages the significance of which will be discussed later on.

"Mr. Walter Pinkard, Jr.
5 E. Redwood Street
Baltimore, Maryland 21202

Dear Walter:
"We are writing this letter to outline to you our agreement with regard to the Sperry Rand Building to be built at Charles Street and the Beltway. This is intended to be a binding letter of intent and *all terms* of this letter *shall be incorporated* in a *formal contract* based on plans and specifications *as soon* as they are *approved* by Sperry Rand Corporation.

"The building is to be 15,600 square feet, all on one floor, with the building dimensions of 156' by 100'. Parking is to be provided for as many cars as can be gotten on the remainder of the three-quarter acre tract. The building itself is to be of structural steel framework with non-bearing walls of block with brick facing on four sides. Roof construction will be of bar joists, metal deck, insulation board and fifteen-year roof. There will be four separate mechanical equipment rooms provided to take care of three leases plus data processing area. Ceiling will be acoustical tile, mineral fissure type, and floors, with exception of bathrooms, will be vinyl asbestos tile throughout. All in-

terior partitions, with exception of dividing partitions between the separate lease areas, will be stud and drywall, taped, spackled and painted. Bathrooms will have ceramic tile floors and wainscot and will have plastered walls and ceilings.

"This, then, is the general outline of the building. *We have not included any site utility work* which may be required for this building but have taken all plumbing, etc., lines five feet outside of building perimeter.

"*As you know, we have to get together as soon as possible with regard to utilities and letting of contracts for them.* We guarantee the above building and paving costs not to exceed $170,000.00. Our fixed fee for this job will be $12,600.00 even if the costs are less than the $170,000.00.

"You, of course, have the right to review and negotiate all subcontracts in any manner you so wish. We however reserve the right to change the amount of our fee should we feel that a subcontractor will require more supervision than is normally needed due to our doubts about his capability to perform in the time required.

"The costs of normal engineering and drawings plus all normal permits, etc., are included in the above. *We do not, however, include any permits for site utilities zoning,* etc.

"Our payment schedule would be the following: Monthly billing—payment within ten days after billing with ten percent retainer to be held back on each payment. Last payment plus all retainers to be paid within thirty days after completion of job.

"Our upset price includes no bond charges. We will work out a plan with First National Bank whereby we will present our monthly requisition with a breakdown of payments to subcontractors covered by that requisition, backed up by copies of their invoices, and present our checks made out to these subcontractors to

the bank. They will then release the checks as soon as our account is credited with the monthly payment. Simultaneously, with final payment of all monies due, we will provide you with complete release of liens from all subcontractors and ourselves.

"If this meets with your approval, please sign where indicated and return two copies to this office.

Very truly yours,
Travelstead & Sons Const.
Co., Inc.
/s/ G. Ware Travelstead
Vice President

GWT:bt

Signed /s/ A. T. Antlitz [at the time a partner in Beltway]

Date 9/24/63"

Whether Sperry Rand Corporation ever approved any plans or specifications is not known. It is clear, however, that no "formal contract" was ever prepared. The only evidence of the understanding of the parties in respect of the Thermo-Fax building is contained in the two letters which are set forth below, passages of which also have been italicized.

"November 20, 1963

"Coordinators, Inc.
5 East Redwood Street
Baltimore, Maryland

Attention: Mr. Philip Iglehart, Vice President

Gentlemen:

"We propose to construct a 4500 S.F. building at your Charles Street and the Beltway development. This building will be occupied by the Thermofax division of the 3M Corporation. The building will be built according to plans prepared by the office of Donald B. Ratcliffe dated November 13, 1963, Sheets A-100 through A-104, and E-101.

"Our price for this project, *exclusive of outside utilities and extraordinary site work,* is :

"FIFTY THOUSAND DOLLARS ($50,000)

"This price includes all permits for construction, *but does not include any applicable area charges.* The price also includes heating and air conditioning which does not show on the drawings.

"Our fee for this work will be $4,000.00, which is included in the above price.

"If this letter agrees with your understanding of the terms please note your approval by signing in the space provided below.

Very truly yours,

Travelstead and Sons
Construction Co., Inc.
/s/ G. Ware Travelstead
Vice President

Approved by :

/s/ Philip Iglehart"

"November 20, 1963

"Coordinators, Inc.
5 East Redwood Street
Baltimore, Maryland

Attention :  Mr. Philip Iglehart, Vice President

Gentlemen :

"This letter will serve as a modification to our letter of this same date which refers to the construction of a 4500 S.F. building to be leased to Thermofax at Charles Street and The Beltway.

"By signing in the space provided below you acknowledge that there is no agreed upon price for this building. The $50,000.00 figure quoted was at your request and for your uses only. We do not feel that we are in a position at this time to quote a fixed cost, and thus cannot do so. As soon as we are in such a posi-

tion, we will then arrive at a definate [*sic*] cost which may exceed or be less than fifty thousand dollars.

> Very truly yours,
> Travelstead and Sons
> Construction Co., Inc.
> /s/ G. Ware Travelstead
> Vice President

"I acknowledge all of the above:
/s/ Philip Iglehart
Vice President of
Coordinators, Inc."

Work on the Sperry Rand building began in late September. The Thermo-Fax project seems to have gotten under way early in December. Beltway, in its answer to the Mechanic's Lien Claim, stated that during the course of construction both contracts "were supplemented from time to time by certain 'extras' which the parties agreed were additional to the work described in the original contracts." Beltway, in said answer, alleges that "certain differences arose between the parties as to the amount of such 'extras,' and as to the *contract prices* of the two buildings, which differences were *settled* by the execution of" the Memorandum (emphasis supplied), which provides as follows:

> "WHEREAS, Joppa Investors, Inc. and Coordinators, Inc. have entered into certain agreements with Travelstead & Sons Construction Co., Inc. and with G. Ware Travelstead for the construction of certain buildings on the North Side of Bellona Avenue west of Charles Street and which buildings are at the present time substantially completed.

> "1. It is agreed that the original contract for the construction of the building for Joppa Investors, Inc., now occupied by Sperry Rand, was for a price of $185,000.00.

> "2. The construction contract for the building for Coordinators, Inc., occupied by Thermo-Fax is $60,000.00.

"3. These contracts were to include the following:

a. Sewer line to public sewer.
b. Water line and meter.
c. Paving and grading.
d. Landscaping.
e. Architects and Engineering.

"4. These contracts did not include:

a. Storm sewer.
b. Relocating electric lines.
c. Rock removal.
d. Area connection charges and costs arising out of the Public Works Agreement.

"5. While it is understood that the costs under the above contract ran in excess of the contract price, it it agreed that the extras over and above the contract for which Coordinators and Joppa Investors are responsible amount to $22,000.00 of which sum G. Ware Travelstead has personally reimbursed Joppa Investors in the amount of $6,000.00 for their losses suffered under the contract. Therefore there is due under these two contracts a total of $267,000.00 less those monies previously advanced including the above mentioned $6,000.00.

"6. It is further agreed that if in the event that Travelstead is able to secure mortgages on these two properties in the total of $270,000.00 at $5\frac{3}{4}\%$ interest for ten years, with a 12 year 2 month level payment plan with a balloon at the end of ten years, then Joppa Investors, Inc. and Coordinators, Inc. will pay Travelstead and Sons Construction Co., Inc. an additional $9,000.00 to offset their loss.

"ATTEST:

JOPPA INVESTORS, INC.

/s/ Walter D. Pinkard     /s/ Philip C. Iglehart
     Secretary             President

COORDINATORS, INC.

/s/ E. W. Travelstead /s/ Philip C. Iglehart
Secretary President

TRAVELSTEAD & SONS
CONSTRUCTION CO., INC.

/s/ Walter D. Pinkard /s/ Will G. Travelstead
Secretary President

Travelstead denies that the Memorandum constitutes a final "settlement" of all of the differences between the parties. It contends that the items in paragraph 4 are excluded from the operation of the Memorandum, that it has not been paid for these items and that it should be allowed to offer proof of Beltway's liability in this regard.

Judge Raine said it seemed "clear to * * * [him] that it [the Memorandum] does amount to a binding written agreement between the parties which precludes the respondent from filing a lien for an additional amount." We take a somewhat different view.

The Sperry Rand contract expressly excluded "any site utility work, * * * permits for site utilities[,] zoning, etc." In the Thermo-Fax contract (first letter) the price quoted is "exclusive of outside utilities and extraordinary site work." Also excluded are "any applicable area charges." Paragraph 4 of the Memorandum appears to confirm what very well may be the case, namely, that the items mentioned were intended to be taken care of by some third person or, if done by Travelstead, that Travelstead would be paid for them.

Beltway contends, and Judge Raine seems to have agreed, that there "could scarcely be a more clear and definitive statement of the precise amount due on the combined project." This might be so if it were possible to say that the items listed in paragraph 4 of the Memorandum are included in the "extras over and above the contract for which" Beltway is responsible. We think it is not at all clear that this is so. To be sure, the Memorandum does provide that "there is due under these *two contracts* a total of $267,000 * * *" (emphasis supplied)

but the items in paragraph 4 are excluded from the contracts. It occurs to us that an analysis of the "extra" items might be revealing although how the parties could ever determine, in the context of these "contracts," what is and what is not an "extra" is beyond our understanding. Nevertheless, this is a chore which the trial judge must undertake because, in our judgment, the motion for summary judgment should not have been granted.

It is true perhaps that there is not much of a dispute about such material facts as have been disclosed but it is also true that those facts appear to be susceptible to more than one inference. Since Travelstead may, at trial, be able to support the inference favorable to it, the court should not have foreclosed by summary judgment any effort in that direction it (Travelstead) may wish to undertake. In our most recent consideration of this aspect of summary judgment proceedings, *Reeves v. Howar,* 244 Md. 83, 89-90, 222 A. 2d 697, 701 (1966), Judge Barnes, for the Court, said:

> "We have held that in a summary judgment proceeding even where the underlying facts are undisputed, if those facts are *susceptible* of more than one inference, the party against whom the inference was sought to be drawn is entitled to the inference most favorable to such party's contentions. *Roland v. Lloyd E. Mitchell, Inc.,* 221 Md. 11, 14, 155 A. 2d 691, 693 (1959). We cited *Roland* with approval and followed the decision in *Mayor and City Council of Baltimore v. Allied Contractors,* 236 Md. 534, 544, 204 A. 2d 546, 551 (1964)."

As the hearing below came to an end counsel for Travelstead directed the court's attention to its demurrer to Beltway's original petition and asked the court to rule on it. Judge Raine was of the opinion that his granting the motion for summary judgment "automatically" overruled the demurrer but he indicated that to accommodate counsel and "for the sake of the record" his final order would provide, as it did, for the overruling of the demurrer. Since neither party has mentioned the

306

matter, either in the briefs or in argument, it will be considered abandoned.

> *Order of 2 August 1965 reversed. Remanded for further proceedings. Costs to be paid by appellees.*